**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | |
|---|---|
| STEPHANIE YOUSIF,<br><br>Plaintiff,<br><br>v.<br><br>DELTA AIR LINES, INC.,<br><br>Defendants. | Case No. ________<br><br>Hon. _______________<br>United States District Judge<br><br>Hon. _______________<br>United States Magistrate Judge |

**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

**PARTIES, JURISDICTION, AND VENUE**

1. Plaintiff Stephanie Yousif is an individual residing in Sterling Heights, Michigan, which is in the Eastern District of Michigan.

2. Delta Air Lines, Inc. ("Delta") is a Delaware corporation with its principal place of business in Atlanta, Georgia. Delta operates facilities at Detroit Metropolitan Wayne County Airport ("DTW") in Romulus, Michigan, which is in the Eastern District of Michigan.

3. This Court has federal question jurisdiction under 28 U.S.C. § 1331 because Yousif brings this action under the Americans with Disabilities Act of 1990, as amended, 42 U.S.C. §§ 12101 et seq. ("ADA").

4. This Court also has diversity jurisdiction over Yousif's state-law claims under 28 U.S.C. § 1332 because the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs, and Yousif is a citizen of Michigan, while Delta Air Lines, Inc. is a citizen of Delaware and Georgia.

5. Venue is appropriate in this District because Delta Air Lines, Inc. operates facilities here, and the facts and circumstances giving rise to Plaintiff's claims took place in this District.

6. Plaintiff Yousif filed a charge of discrimination jointly with the Michigan Department of Civil Rights ("MDCR") and the EEOC. On July 16, 2026, the EEOC issued Plaintiff her Notice of Right to Sue. She has filed this Complaint within 90 days of receipt of her Notice; therefore, Plaintiff has met the exhaustion requirements of the ADA.

## FACT ALLEGATIONS

7. Delta hired Yousif on May 2, 2011, as a seasonal Customer Service Agent at DTW, beginning a career that would span fourteen years.

8. Shortly after she was hired, Delta converted Yousif to "ready reserve" status, under which she worked full-time hours—30 or

more hours per week—but did not receive the benefits associated with full-time employment.

9. Yousif worked as a ready reserve employee for approximately the next ten years.

10. Yousif is a person with a disability and lives with lipedema and secondary lymphedema, conditions she has managed throughout her career at Delta.

11. Yousif's lipedema and secondary lymphedema are rare, chronic conditions that substantially limit one or more major life activities and qualify as disabilities under the ADA and the PWDCRA.

12. Yousif's conditions require her to perform manual lymphatic drainage for at least three hours each day, in addition to water therapy and other forms of treatment.

13. In 2018, Yousif requested a transfer from ready reserve back to seasonal status.

14. Yousif sought the 2018 transfer to seasonal status because part-time seasonal shifts allowed her to better manage her disability.

15. When Yousif worked full-time hours or more than 30 hours a week, her symptoms progressed more quickly and she was less able to

sustain that schedule before needing medical leave; however, the part-time seasonal shifts allowed her to go significantly longer without needing leave.

16. Delta's bidding system allows seasonal employees to select their schedules and shifts on a recurring basis, alternating between a winter season (September to April) and a summer season (April to September), with priority based on seniority.

17. Yousif's seniority, reset in 2018 as a result of her transfer to seasonal status, climbed over the following seasons from the bottom of a pool of more than 100 employees to No. 3 by the 2025 season.

18. Yousif worked seasonally in the years following her 2018 transfer, up until her 2023 surgery.

19. Over her fourteen years at Delta, Yousif worked Delta's ticket counters, interacting directly with the traveling public.

20. Throughout her employment, multiple managers who supervised Yousif described her as someone who went above and beyond.

21. Yousif disclosed her disability to Delta directly for the early days of her employment: She informed Gwyneth Douglass, the Delta

supervisor who coordinated her return-to-work clearances and badging throughout the mid-to-late 2010s, that she had a disability.

22. Douglass was the manager to whom any request involving Yousif's leave, restricted return to work, or shift changes had to be routed.

23. Thus, Delta has known Yousif to be a person with a disability since the early days of her employment.

24. On information and belief, Kate Cossner, Delta's Employee Support Manager, and her assistant, also received information about Yousif being a person with a disability in the course of handling Yousif's leave and return-to-work requests, and therefore also knew of its disability-related nature.

25. Because of her disability, Yousif has, in the past, had to take leaves of absence from her employment with Delta.

26. In almost every season before 2025, when Yousif needed to take short-term disability leave, Delta would not allow her to return to work while under any medical restriction; it required her to return entirely restriction-free.

27. Because Yousif's conditions are chronic, she could not return restriction-free.

28. On at least one occasion, Delta asked Yousif to have her doctor certify that she would never again experience symptoms of her chronic condition, a certification no doctor could give for a chronic illness.

29. As a result, in almost every season, Delta required Yousif to sit out the remainder of the season regardless of when her medical leave ended, in a six-month season, sometimes for as long as five months.

30. In 2023, Yousif underwent bariatric surgery.

31. Yousif scheduled that surgery during her off-season so that it would not require missing any scheduled work at Delta.

32. The following season, the 2024 season, Delta did not call her back as it did not need seasonal employees.

33. The next season Yousif worked following her surgery was the 2025 season.

34. At the time of the 2025 season, Yousif was ranked No. 3 in seniority, meaning she had the third-highest priority in choosing her shifts.

35. Yousif's mobility improved from the surgery so much that she completed her 2025 season with one sick day, the first season in her

fourteen-year career that she was able to complete without being forced onto leave before the season ended.

36. For all employees, including seasonal employees, Delta issues a badge to clock in at the start of each season.

37. On information and belief, badge errors are common and expected during roughly the first week of a new season while employees are being onboarded, and affected employees are directed to clock in using Delta's QR-code system in the meantime.

38. When Yousif returned to work for the 2025 season in February, her badge did not work.

39. Management initially told Yousif to use the QR-code system, consistent with Delta's standard onboarding practice for badge errors.

40. The 2025 season was the first time Yousif had ever used the QR-code system, which Delta had implemented during the Covid-19 pandemic, when seasonal status workers were not employed.

41. When Yousif's badge still did not work well beyond the first week of the season, beyond the period in which badge errors are ordinarily

expected, she was confused and had no understanding of what the problem was.

42. Throughout the time Yousif was assigned to work, February to April of 2025, she was never given a working badge.

43. Yousif began to document her badge errors to maintain a record, in fear that the errors would be used against her.

44. For instance, on February 19, 2025, Yousif photographed the clock in system saying "Invalid badge number" error tied to her badge, No. 315681.

45. She sent this documentation to Katie Cossner, a Delta Office Manager, to notify Delta management of her badge issues.

46. Rick Callaway, Delta's Below-the-Wing Training Manager, also personally confirmed that Yousif's badge did not function.

47. When the badge malfunctioned again, Yousif reported the issue to her Training Manager, Amanda Fesko, as Yousif was assigned to training that day.

48. Fesko instructed Yousif to use Delta's QR-code system instead.

49. Fesko also instructed Yousif to submit her hours through the QR-code system going forward.

50. Fesko told her that when using the QR-code system, she should submit her scheduled bid time, not the actual time Yousif clocked in and out.

51. Because this was Yousif's first experience with the QR-code system, and because a Training Manager gave her this instruction directly, Yousif had no independent basis to question whether Fesko's instructions were accurate.

52. In prior years a time slip was used instead of the updated QR code and the process was to submit the shift time worked.

53. Yousif used the QR-code system under these instructions for the remainder of the 2025 season.

54. Yousif had no reason to question the guidance from the Training Manager to use the QR code process.

55. Delta's training staff also submitted Yousif's time using her scheduled shift time, consistent with Fesko's instructions.

56. Badge-swipe and security-screening records show Yousif entering the South Employee Lot at 6:43 a.m. on February 19, 2025, consistent with a 7:00 a.m. shift start.

57. Those same records show Yousif entering the South Employee Lot at 6:31 a.m. on February 20, 2025.

58. Delta management did not notify Yousif about her clock-in discrepancies at the time they happened during the 2025 work season.

59. On April 26, 2025, near the end of the season, Employee Support raised the badge issue with Yousif for the first time, during a shift.

60. Yousif explained that she had one workday remaining before her seasonal leave began.

61. Employee Support told Yousif not to address the issue further, and that she could do so upon her return the following season.

62. Yousif worked her last day of the season on April 30, 2025.

63. Yousif began her leave believing, based on Delta's own instruction, that the badge issue would be resolved for the next season because employees are required to turn in their badges at the end of the season.

64. More than two months later, on July 8, 2025, Ahmad Hassan, Delta's Operations Manager, contacted Yousif and asked her to attend a meeting.

65. Neither Hassan nor the Employee Support Manager, Kate Cossner, told Yousif the purpose of the meeting in advance.

66. At the meeting on July 10, 2025, Hassan told Yousif for the first time that she had allegedly clocked in late seventeen times that season.

67. Yousif told Hassan that she had followed the QR-code process Fesko had given her.

68. Not until this meeting did anyone at Delta tell Yousif that she was supposed to have submitted her actual clock-in time rather than her scheduled time.

69. Based on Fesko's status as a Training Manager and Delta's prior practices, Yousif had no way of knowing that Fesko's instructions were incorrect.

70. Yousif told Hassan she had no indication her scans were registering as late.

71. Yousif told Hassan that training staff had observed present and ready to work at shift start.

72. Hassan told Yousif that her clock-ins were measured by the time she arrived at the employee parking lot.

73. Based on the parking-lot arrival time, Hassan told Yousif there was no way she could have arrived at her shift on time, because it would take more than 15 minutes to walk from the parking lot to her actual work location.

74. Hassan informed Yousif that there were other employees who also had clock-in issues around the time Yousif had them.

75. Hassan also instructed Yousif not to contact her supervisor about these issues and to keep the matter quiet during the investigation.

76. Hassan further explained to Yousif that each individual employee's clock-in issues were addressed based on that individual's work history and not according to a standard rule, procedure, or guideline.

77. Hassan informed Yousif that different employees with the same clock-in issues would have different outcomes for discipline and future employment.

78. Thus, Hassan admitted that Delta considered Ms. Yousif's work history, including her status as a person with a disability, in deciding how to handle her clock-in discrepancies in 2025.

79. Delta suspended Yousif immediately following that meeting, without pay, effective that day.

80. Delta memorialized the suspension in a written letter dated July 10, 2025, placing Yousif on inactive status.

81. Delta revoked Yousif's standby flight benefits, including four confirmed tickets she had earned through her service during the Covid-19 pandemic.

82. On information and belief, Delta employees are supposed to keep confirmed tickets regardless of employment status.

83. These standby and confirmed-ticket flight benefits were extremely important to Yousif and a primary reason she worked for Delta, as Yousif needed on occasion to fly to distant and even international locations to receive medical treatment related to her disabilities.

84. At Hassan's request, Yousif wrote a written statement at the meeting to explain the discrepancies, which would be sent to the Delta HR employees reviewing her case.

85. The following day, July 11, 2025, Yousif added to the statement and emailed and texted her additions to Hassan.

86. In that statement, Yousif said:

> As instructed by my leaders, I used the QR code system as an alternative. In multiple times staff from the training room came with me to the time clock to try and see if it was working

> and it was not. I genuinely did not know that I was scanning as late, especially when I was heading in and starting right away…At no point was I made aware that this was resulting in late entries, and I was under the good faith belief that I was in compliance with Delta's timekeeping policies. Had I been notified earlier, I would have addressed the issue immediately and corrected it. I respectfully request that these entries in question be reviewed in light of the circumstances and the badge malfunction.

87. That same day, July 11, 2025, Yousif texted Hassan requesting a copy of the specific discrepancies Delta had identified.

88. Hassan initially told Yousif he would provide the dates, but then said, after speaking with HR, that he was not able to send the records because the investigation was ongoing.

89. Yousif also provided Hassan a specific explanation for one flagged date, April 30, 2025, when Delta had reassigned her from the ticket counter to training that day.

90. This reassignment on April 30, 2025, required Yousif to use a different parking location.

91. That different parking location resulted in a later arrival at her training station than her scheduled swipe time reflected.

92. During this period, Hassan assured Yousif that he was advocating for her.

93. Yousif asked Hassan to add this explanation to her statement.

94. Hassan agreed to add the explanation but never did.

95. Hassan told Yousif she would receive a decision within one week.

96. Two weeks later, on July 22 and July 23, Yousif contacted Hassan again to learn what the decision was, but Hassan said there was no decision yet.

97. Yousif contacted Hassan again on July 29, 2025, but again there was no decision from Human Resources yet.

98. On August 1, 2025, Hassan informed Yousif that Delta's legal department wanted to ensure they were “on the same page with the multiple statements.”

99. Hassan also told Yousif that a corporate group in Atlanta reviewed cases like hers to “ensure fairness.”

100. Throughout this period, Hassan repeatedly told Yousif that he was advocating for her.

101. On August 8, 2025, Hassan called Yousif and told her she could either resign or accept an involuntary termination.

102. Delta subsequently emailed Yousif and formally terminated her fourteen-year employment.

103. Delta's termination email was vague in explaining the precise category of employee violation on which it relied to justify terminating her employment.

104. Yousif did not learn until she received her personnel file in October 2025 that Delta had internally categorized her termination as being for "integrity" reasons.

105. This came as a surprise to Yousif because during the meeting, Hassan and Cossner cited the attendance discrepancies as the reason for the suspension, even though Yousif had explained these alleged violations from the outset and demonstrated that she had reasonably relied on the instructions of the Training Manager.

106. Yousif also learned at that time that Hassan was the manager who recommended her termination—the same manager who had spent the preceding month telling her he was advocating for her.

107. In the course of seeking her personnel and disability records to review the facts and circumstances leading to her termination, Delta consistently thwarted her efforts through needless delays, ignoring her calls, and giving her the run-around on what procedure was needed to obtain these records.

108. The lack of communication from Delta during this time caused Yousif great stress because she only had six months from the time of her termination to appeal.

109. Because of this stress, Yousif was put on medication for depression.

110. Delta maintains a progressive discipline protocol consisting of a verbal warning, written coaching, and suspension before termination.

111. Upon an initial late clock-in, employees are supposed to receive a call informing them that they were late.

112. If subsequent late clock-ins occur, employees must go through a coaching.

113. After any subsequent clock-in issues, suspension is considered.

114. Yousif was never given any warnings or coachings regarding this issue.

115. Delta bypassed each of these steps in Yousif's case, proceeding directly to unpaid suspension and termination.

116. Yousif was eventually terminated without Delta adhering to its own stated policy.

117. The clock-in discrepancies Delta cited as the basis for Yousif's suspension and termination were the product of Delta's own malfunctioning badge and the alternative timekeeping method Delta's own Training Manager, Amanda Fesko, instructed Yousif to use in its place.

118. On information and belief, another employee with a history of using sick leave to manage a disability was also terminated because of similar clock-in issues.

119. On information and belief, non-disabled employees who experienced similar badge malfunctions and used the same Delta-authorized alternative timekeeping method were not subjected to comparable scrutiny.

120. On information and belief, those same non-disabled employees were not subjected to comparable suspension or termination.

**COUNT I: DISABILITY DISCRIMINATION**

**(Americans with Disabilities Act, 42 U.S.C. § 12112)**

121. Yousif realleges and incorporates by reference every allegation above as though fully stated in this Count.

122. Yousif is an individual with a disability under the ADA because her lipedema and secondary lymphedema substantially limit one or more major life activities.

123. Yousif could perform the essential functions of her Customer Service Agent position, with or without reasonable accommodation.

124. Delta knew of Yousif's disability and her history of disability-related leave since at least 2017.

125. Delta at all times had real-time access to her clock-in records all season and raised no concern.

126. Rather, it waited more than two months after the season ended to say anything and refused to show Yousif the time sheet or the specific discrepancies during its own investigation.

127. What's more, Delta manufactured the very discrepancies it relied on: its own Training Manager told Yousif to use the QR-code system, Delta had accepted that same method without objection on multiple prior occasions, and Yousif's badge failed only because Delta never fixed it.

128. Delta abandoned its own progressive discipline policy for Yousif and treated her more harshly than non-disabled employees who used the

same Delta-authorized timekeeping method, because of her disability and her history of disability-related leave.

129. Delta's discrimination has cost Yousif lost wages and important flight benefits that helped her with travel for medical treatments, diminished earning capacity, emotional distress and mental anguish, damage to her professional reputation, and other economic and non-economic harm.

**COUNT II: DISABILITY DISCRIMINATION**

**(Michigan Persons with Disabilities Civil Rights Act, MCL § 37.1101 et seq.)**

130. Yousif realleges and incorporates by reference every allegation above as though fully stated in this Count.

131. Yousif is an individual with a disability under the PWDCRA who could perform the essential functions of her position with or without accommodation.

132. Delta suspended and fired Yousif because of her disability, for the same reasons set out in Count I, which Yousif incorporates here by reference.

133. Delta's discrimination under the PWDCRA has cost Yousif lost wages and valuable flight benefits that helped her travel for disability-related medical treatment, diminished earning capacity, emotional distress and mental

anguish, damage to her professional reputation, and other economic and non-economic harm.

**REQUEST FOR RELIEF**

WHEREFORE, Yousif asks this Court to enter judgment in her favor and against Delta, and to award:

A. A declaratory judgment that Delta's conduct violated the ADA and the PWDCRA;

B. Reinstatement of Yousif to her former position;

C. Compensatory damages for all economic losses, including back pay, front pay, lost benefits, including the flight benefits that would have allowed her to travel for medical treatments at little to no cost, and diminished earning capacity, in an amount to be proven at trial;

D. Compensatory damages for all non-economic losses, including emotional distress, humiliation, mental anguish, and damage to professional reputation, in an amount to be proven at trial;

E. Punitive damages to the extent the law allows;

F. Pre-judgment and post-judgment interest as the law provides;

G. Reasonable attorney's fees, costs, and expenses under 42 U.S.C. § 12117, Mich. Comp. Laws § 37.1201 et seq., and other applicable law; and

H. Any other relief this Court deems just and proper.

Respectfully Submitted by:
<u>*/s/Robin B. Wagner/*</u>
Robin B. Wagner P79408
Attorney for Plaintiff
Robin Wagner Law, PLLC
402 W. Liberty Street, rear
Ann Arbor, MI 48103
734-294-3035 (phone & fax)
robin@robinwagnerlaw.net

September 23, 2026

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | |
|---|---|
| STEPHANIE YOUSIF,<br><br>Plaintiff,<br><br>v.<br><br>DELTA AIR LINES, INC.,<br><br>Defendants. | Case No. ________<br><br>Hon. _______________<br>United States District Judge<br><br>Hon. _______________<br>United States Magistrate Judge |

**JURY DEMAND**

Plaintiff Stephanie Yousif hereby demands a trial by jury.

Respectfully Submitted by:

Respectfully Submitted by:
*/s/Robin B. Wagner/*
Robin B. Wagner P79408
Attorney for Plaintiff
Robin Wagner Law, PLLC
402 W. Liberty Street, rear
Ann Arbor, MI 48103
734-294-3035 (phone & fax)
robin@robinwagnerlaw.net

September 23, 2026